Good morning. Let's wait and let everyone get settled. Oh, I'm sorry, yes. Okay, Mr. Sells. Good morning, Your Honors, and may it please the Court, I represent the estate of Mr. O'Neill, and I'm going to be talking to you today asking that the Court reverse a decision made regarding summary judgment, as well as a decision made to preclude the use of an expert report that we believe was submitted timely. I'm going to start with the last issue first. In this case, we asked for expert discovery right from the beginning. It was no secret the first case management order indicated that we wanted to engage in expert discovery. We made a motion as time was going on to extend the case management deadlines. In that first motion, we asked that all discovery be extended. The Court granted that and extended the CMO deadlines. The expert deadline was given for July 5th, and the closed discovery deadline was set for September. During the course of that second CMO, we engaged in discovery. We tried to. We tried to get depositions. We tried to do a lot of different things. July 5th passed, but on July 29th in 2022, and this is something at the record, and I'll indicate to the Court where it was, the record page 186, the record on appeal, we sent a 30B6 deposition notice to the county and the attorneys for the defendant. In our 30B6 notice, we specifically referenced expert discovery. There, it's page 187 of the record, we indicated that we wanted the curriculum vitae of any experts that were intended to be called to testify on the case. We asked that they produce any copy of documents, photographs, or videos which any experts were using in support of their case. We asked for a copy of any documents, objects, or anything else that was reviewed by their expert. Didn't the government say it had no experts? Excuse me, the county say it had no experts, the defendants? No, the county did not. The county did not respond to this notice, and they did not object to this notice. Did they at any time in these proceedings say that they would not be presenting experts or expert testimony? They did not, no. They did not. And as I go through the record, I think, Your Honor, we'll see more clearly. But we made it very clear that we intended to engage in expert discovery. And so the notion that we had abandoned it or that we had decided that we weren't going to engage in expert discovery was not the case at all. This happened in July of 2022. Subsequently, in August, we reached out to the defendants and asked them would they agree to extend the CMO deadlines. And they agreed. They made no objection about our request for expert discovery. And we identified docket 41, because this is in the docket. Our notice for this 30B6 discovery was in the docket. We put it in our motion, both of our motions, to extend the CMO deadlines. And so we identified it for both the magistrate judge as well as the district court judge that we intended to get discovery based on this docket 41. Those motions appear in the record at page 202 through 207, and then again from 207 through 209. So we let the court know that that was an outstanding item that we sought, extension so that we could engage in expert discovery. And so when the court, the district court said that it would extend the trial date so that we can engage in discovery, and said that the magistrate judge would reset all deadlines associated with the case, we rightfully believed that that included discovery on experts. And consistent with the Betzel case, which your Honor authored, that's the way it's supposed to work. If there's a trial continuance, then you can engage in both fact and expert discovery. Here, when the magistrate judge issued the order saying that all discovery is to be completed by December 1st, there was no distinction drawn between fact and expert discovery. Despite the fact that when the magistrate judge eventually ruled on the motion to exclude the expert report, he specifically referenced that there's two distinct types of discovery, fact and expert. So his use of the word all would encompass both. That's the common understanding, and that is exactly what we believed it to be. But to take it one step further, he also, in his order, his initial order extending the case management deadlines, said that there would be a period for Daubert motions, that the Daubert motions were to take place 15 days after the end of all discovery. So we rightfully believed that there was expert discovery contained within the order. And so when we filed our expert report and then got a motion to exclude it, we believed it to be frivolous because we believed that we timely filed our expert report and that there would be time, if the defendants wanted to, to strike it. Mr. Selge, you can use your time however you please, but you've used half your time now on this discovery issue, and you might want to talk to us about deliberate indifference and the actual facts of the case. It's up to you. No, absolutely, Your Honor, and I will do that. You're not challenging the summary judgment on the sheriff, are you? Yes, we are. Where in the brief did you retain that? Well, Your Honor, I think where we say it is when we talk about the exclusion of the expert report, because our expert, report is considered. Maybe move on to the constitutional violation with focus on event, defendant event. Yes. Whether. Right, so with regard to event, defendant event, we allege that she disregarded clear indications, clear evidence of the dangerousness of Mr. Henderson's arresting officer, Officer Smith, that he had in his possession a knife, that he was going to pull that knife, that he was threatening his two grandmothers, that he had come down from a two or three day high, so she also was aware that he was using drugs, and she had knowledge, once she looked him up, that he had come to the detention center previously on a hold, right? And the policy of the prison, when someone was brought in on a hold from the Chancery Court, that they were supposed to be segregated and separated, so she knew that he had a history of some psychiatric issues. Now, notwithstanding that information, she also questioned Mr. Henderson when he came in, and during the questioning, she left open three categories, or two questions related to whether or not he was alcohol, right? She did not answer those questions on the sheet. She went through virtually everything else, but didn't answer those questions, which calls into a question, a question of fact, and if you look at the evidence in the light most favorable to the non-movement, her failure to look at those facts and make a determination that Mr. Henderson was a danger should be left to the jury. Now, the court utilized a subjective standard, and in using that subjective standard, relied upon the testimony of Defendant Ivan in order to establish that there was no constitutional violation here, and we think that that was incorrect, because in her testimony, Officer Ivan was all over the place. Her credibility is definitely at issue. At one point, she indicated, well, I don't remember this incident. I don't remember anything about Mr. Henderson and my interactions with him, and then at other places, she indicated, oh, I remember this, and this is why I did what I did, and so the idea that the district court put itself in a position of determining credibility was error, so not only the use of the subjective standard as opposed to the objective standard that the Supreme Court seems to, at least in our view, indicate should be used pursuant to Kingsley, the court actually engaged in what we believe an erroneous use of credibility determination. This court obviously has the power to and will look at this de novo, and I would ask that the court look at the discrepancies within Defendant Ivan's testimony. Your argument to us, though, as a panel is not turning on application of Kingsley, is it? It's not. Absolutely not. So if Judge Aycock, in her 36-page order, did agree that there was substantial risk, what she said that there wasn't was evidence showing that in turn, Ivan deliberately was indifferent to that risk. Right, and we disagree with that, and we think that that's a question of fact for a jury. And then, but attendant to that, she also dropped a footnote and said, regardless, you haven't shown clearly established law that an intake officer faced with these circumstances would know not to co-house cellmates. What's the clearly established law that you gave the district court? Well, we cite in our brief the Brown case. Right, but in Brown, that related to the supervisor, the sheriff, who ultimately was found not to have been deliberately indifferent. Right. So what's the case that shows that someone in the circumstances of Ms. Avant violated clearly established law when she made the determination, perhaps because simple assault was crossed out, whatever, to co-house these two people? What's the case? Your Honor, let me, I'll have to get back to you on that. Well, no, it's not getting back to me. It's did you give any case to the district court other than Brown? Yes or no? We cited 12 cases related to . . . I didn't see that those related to . . . Well, I mean, nothing directly on point. So we don't have any, I don't think we cited anything directly on point. That's, isn't that fatal? I don't believe so, Your Honor. I think that this is such a bright line area that where someone presents a danger that it's . . . Your time's running out. If the case you gave her to establish clearly established law was Brown, how did you draw that from Brown? What's the rule of law you took from Brown? That a booking officer or someone who's responsible for placement should be aware of the danger. In this case, the danger being not only a dangerous individual, but also the fact that the cell itself had a ligature, a ligature that could be used to kill. And now, we were able to establish facts in the case indicating that the sheriff's department would remove, for example, shoelaces, or they would remove other items that could be used to kill as a ligature. And yet, the county itself put a phone cord into the cell. But I see my time is up. I'll come back to you. You've saved time for a bottle. Thank you, Mr. Sells. Mr. Martin? Good morning, Your Honors, and may it please the Court. I'm here today on behalf of Appalese, and I ask the Court to affirm the district court's order, the reason being to preserve the district court's authority to manage their dockets and maintain integrity of judicial proceedings, to prevent future dilatory behavior, and to protect government officials from civil damages from liability when their actions could reasonably be believed to be legal. Judge Higginbotham, I think your question— He's down there. Sorry, Higginson. The Higgs got me confused. Higginson, to your question. Their failure to point to clearly established law is fatal. I've done independent research on this to no end, and there's nothing that would suggest a booking officer, whenever they make an assignment of an inmate, they are going to be subsequently liable for the death of that inmate days later. I guess, though, just—I know this is counterfactual, but assume the chancery hold had come in before she made the assignment, and so it specifically said the grandparents are so scared they won't even sleep with him. As far as the chancery hold goes— If that had come in— If it had come in— You still would say— We don't know. Those chancery court holds are often confidential, so sometimes it wouldn't be the entire text. I know, but I—and I know it didn't even come across the facts, so I said it's counterfactual, but I'm just testing the proposition that no booking officer would ever be responsible, no matter what they knew about Mr. Henderson—violence, substance abuse, outbursts, attacked his own grandparents—you would still say— Based on Officer Avant's own testimony, had that chancery court hold come in, she would have put him aside. There was no chancery court hold in this case. I believe Mr. Sales intimated that, but Mr. Henderson was arrested by West Point Police on the day of. His grandfather or grandmother did not fill out the petition for a mental evaluation or drug and alcohol treatment until the next day, and then it didn't come in from the chancery court until the day he died. Officer Avant acted reasonably under the circumstances. Mr. Henderson came in. She interviewed him. She talked with Officer Smith. They figured out, you know, what his charges were. She understood them to be a misdemeanor charges. She assigned him to a misdemeanor cell. All told, in her deposition, she said that they spent about 10 minutes together. Nothing was ever established through her deposition testimony that Henderson acted in any way that would suggest to her that he was going to be acting out in jail. Now, below, plaintiffs did establish with Officer Smith that when they were driving to the jail that Mr. Henderson was acting agitated, but we know nothing about his agitation past the patrol car on his way to the jail. In these 10 minutes that he was with Officer Avant in booking, there was nothing to suggest that he would be a problem to his cellmate once booked. Again, she did see a fact issue as to substantial risk based on Smith saying possibly he had a weapon. Possibly. That's what the district court judge found. You know, as I raised below and I raised in the briefing here, inmates don't have a constitutional right to sell assignments or whoever is going to come in and be their cellmate. We believe that's preclusive even to the failure to protect. That's how Mr. Henderson got into the cell with Mr. O'Neill is through an assignment. Most of plaintiffs pleading, most of plaintiffs' deposition questions of Officer Avant was all about cell assignment. Why did she assign and classify him the way that she did? She did that because she was following her protocols and procedures. As far as the judge, you know, seeing that, we again argued that it didn't rise to the level in the questioning that Officer Avant would have been aware that he was going to do that to his cellmate. We have a pre-incarceration action versus post-incarceration action essentially. We have to look at the violation of particular violative conduct here. As he came into the jail, she had no indication that he would be in any way harmful to his fellow inmates. That just has never been established. For that reason, the district court was correct in finding, excuse me, incorrect in finding that, I'm sorry, I lost my train of thought. Regardless of whether there was that substantial risk of harm, which we argue is not present, the facts in the case do not demonstrate that Officer Avant was subjectively, deliberately indifferent to that. That is the rule of law in this circuit. The rule of orderliness says that that's what this court does. Subjective indifference, even in our court and the Supreme Court, it can't be negligence, but it also doesn't have to be direct evidence of disregard. The agree? Yes. And you're just saying here there was no such obvious threat? There was nothing in those 10 minutes that Officer Avant saw Mr. Henderson to suggest that it was obvious. At best, this is negligence. At best, it's negligence. There's nothing to indicate that she was reckless in the way that she handled Mr. Henderson. There were portions of the intake sheet that I read over. I know the two portions. It's questioning about drugs and alcohol use, which is what it turns out was contributory. Sure. And I understand the potential for implication there. At the same time, and we raised this below, Mr. Henderson was otherwise able to answer questions. In the light most favorable to Culberson, what did Smith tell Avant? In his deposition, when I asked him that question, he said that he could not remember the specifics of what he told Avant. That is, he just did not remember. Now, his charges would have said the disturbance of the peace, the business, and that there was the simple of assault by threat on there. And I believe there was mention that he had a knife, but I would say 95% of the men in Mississippi carry a pocketknife with him. Now, the implication of him saying, I will use that on my grandparents, that's a threat against them. At no point in time when he booked in did he say, I'm going to kill my cellmate. I didn't think even the evidence against the grandparent was before her. It was not. It was not. I'm merely saying. My last question is, why is there a four-foot phone cord in any of these cells? I believe it was a two-foot cord, but they've been in there for ages. They were there for the inmates to easily call. Instead of having a cart push around or go out, they've just been in there. Since then, the phone cords have been shortened, another service provider, but they were in there. Even to that, and I believe it's Cope v. Cogdill, speaks about phone cords in cells. Along those lines at this instance, this was the only time that those phone cords had ever been used to harm anyone. There wasn't anything that would give the jail any kind of advance notice that Mr. Henderson would use that to kill his cellmate. As far as appellant's argument about their expert discovery, by the time everything was going on that Mr. Sells mentioned, plaintiffs had not designated their experts by the expert discovery deadline. It had lapsed. Since plaintiffs did not designate experts, defendants did not designate experts. But that time was extended and there was language, I'm saying this, you can correct me if the record shows otherwise, but there was language indicating in regard to the extension that it included all expert discovery deadlines. Let's break it down, Judge. The magistrate's order was directed to extend all discovery deadlines, including submission of Daubert motions. Submission of Daubert motions just presumes that there have been experts designated. Again, they never were in this case. All discovery, I know Mr. Sells talks about a general understanding of what all is. Well, let's have a general understanding of what discovery is. Depositions, interrogatories, requests for production. Under Rule 26, the expert designation is arguably different than discovery. It's usually something that takes place even before the telephonic case management conference. It's got a separate designation on the northern districts and there were no experts to depose. There were no experts upon which anyone could even draft a Daubert motion. Another glaring issue with appellant's argument is that even if they could reasonably believe that they could submit their expert report and their expert designation on the final day of discovery, with only two weeks remaining on the order for those Daubert motions, how can you condense a rebuttal expert, depositions of their expert and go through all the discovery that would be needed? They seek out a very long period of what would be entirely unreasonable for them to designate their expert on the last day of discovery, particularly when the expert discovery deadline had been passed and they didn't ask for a further extension on that. As far as the abuse of discretion, Judge Smith, the court did not abuse its discretion here. Plaintiff's or appellant's reason, as I just said, was the importance of their expert's report. But that expert report, were it so important to them? And Betzel cites Geiserman and one other case about if that report was so important, why did they not designate earlier? Why was that something that wasn't so important in their case that they referenced, hey, we need to get this. We need a motion for expert designation deadline. They did not do that. The record is devoid of that. It would be helpful if you didn't have an order that said all discovery. Sure, your honor. I understand that. But all means all. I thought, frankly, my reaction to that was the magistrate was a little quick and sharp on that. But it meant what consequence it has. And again, to the magistrate, whenever he put his order out after that, he was very specific and narrow in the remaining deadlines. And I understand. I don't like the earlier order. Sir? I don't like the earlier order. You added an order that's all discovery. I frankly think lawyers and titles do that. I understand it's a separate structure for dormant motions, of course. But that's why you don't enter an order that says all. That was just an error. And I'll leave it at that. But the magistrate needs to, that's why we have magistrates to do it. Be careful about those details. And, you know, Judge Higginbotham, as far as the magistrate goes, you know, his order came down, her decision on striking the expert came down. Appellants took it up to Judge Acock. Judge Acock found that he had not abused his discretion. And she subsequently did not consider the expert report in her grant of summary judgment, which we believe is proper here. And, you know, earlier when I mentioned to preserve the district court's authority to manage their dockets, in striking an expert, I know that this court is loathed to question that. Were this court to reverse and allow plaintiffs late behavior, particularly when the court had granted one continuance, all that is going to do is allow other plaintiffs to push the envelope. They can say, well, I could designate on the last day of discovery. That is going to create an untenable logjam in the district court's dockets. They have to effectively manage their cases. That's why we have case management orders. When we don't abide by them, when we miss deadlines, there are consequences. For that reason, we ask that the court affirm as well. And then, your honors, there is the issue of qualified immunity, which I know it was in a footnote, but Officer Avan is entitled to that. In her booking, she made a discretionary decision, qualified immunity protects officers who make those discretionary choices, especially when there is no violation of clearly established law. And for those reasons, we will ask that the court affirm. Does any judge have any further questions? All right. Thank you, Mr. Martin. Mr. Sells for rebuttal. Thank you, your honors. Judge Haynes, I just wanted to get back to you on your question about the cases. We cited a number of cases that established that the placement of someone who is a known danger, primarily to themselves, constitutes a violation, one that is a triable fact. And we cited Partridge versus two unknown police officers, Greeson versus Kemp, Gaughan versus Montgomery County, Vieiro versus Bufano, Guglielmo versus Alexander, and Mache versus Lace. So we cited all of those cases for the proposition that someone who presents a danger, and it's known, a known danger, and they're placed into a cell where harm is subsequently done, that gets us to a jury. And so I ask that you look at those cases. Getting back to the argument that was just made by the county, you know, about like, if this was so important, it should have been done on time. Number one, we believe that we filed our expert disclosure on time. The Howard case, which is a case that Mr. Smith's law firm was involved in, they filed an expert report on the last day. And in this circuit, that's permissible. His firm is a poster child for that. In terms of the CMO deadlines, your Honor, in Betzel, made it clear that, first of all, the argument that, you know, if this was so important, it should have been done timely. In Betzel, your Honor said that that logic is flawed. You said it in your opinion. That's putting the standard on its head to say that because it, you know, because it was so important, it should have been timely. That's not a valid argument, and Betzel says so. At the end of the day, your Honor, this case is a very important case. It talks about safety of prisoners. It gets into life and liberty and everything that we hold dear. For those reasons, the reasons that we put in our brief and in this argument, we ask that you allow Mr. O'Neill's family to have his day in court. And if there are no other questions, I'm good. Thank you, Mr. Sellers. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.